******************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

## STATE OF CONNECTICUT *v.* CARL SMALL
### (AC 40238)

Lavine, Sheldon and Bear, Js.

*Syllabus*

Convicted of the crimes of murder, burglary in the first degree, larceny in the third degree, larceny in the fourth degree, stealing a firearm, criminal possession of a firearm, sale of narcotics and possession of narcotics, the defendant appealed. The defendant had sold ecstasy pills to the victim at the victim's apartment, where the victim kept a collection of firearms and knives. When the victim came to suspect that he had been sold a substandard product, he told a friend that he intended to meet with the defendant to either obtain new ecstasy pills or to get his money back. Shortly thereafter, the victim's body was found in his apartment. The victim had been stabbed to death, and his firearms and other possessions were missing from the apartment. A bloodied mop was found in the bathroom of the apartment, and a bloody fingerprint was found on a window latch in the bathroom. A knife that belonged to the victim also was found in the home of L, where the defendant had gone on the night of the murder, and the defendant communicated on Facebook with R, a member of a national street gang, seeking to sell R one of the victim's guns. The trial court denied the defendant's motion in limine to preclude an agent with the Federal Bureau of Investigation (FBI) from testifying about criminal gangs and the defendant's Facebook communications with R. On appeal, the defendant claimed, inter alia, that the trial court abused its discretion in admitting certain evidence about criminal gangs. *Held*:

1. The trial court did not abuse its discretion in allowing the FBI agent to testify about R's gang involvement; R's gang affiliation, if credited by the jury, was probative of the defendant's identity as the perpetrator of the victim's murder on the basis of his desire to sell the victim's firearms through various means in the aftermath of the murder, and the probative value of the FBI agent's testimony was not outweighed by any unfair prejudice to the defendant, as there was no allegation that the defendant was a gang member, and the FBI agent's testimony demonstrated only R's gang involvement.

2. The defendant could not prevail on his claim that certain improprieties by the prosecutor during her closing arguments to the jury violated his right to a fair trial:

   a. This court declined to review the defendant's unpreserved evidentiary claim that the prosecutor improperly elicited false scientific evidence and commented on such evidence during closing argument when she allegedly argued that the random match probability, which is the probability that a member of the general population would share the same DNA with the defendant, was the same as the source probability, which is the probability that someone other than the defendant was the source of the DNA that was found on the mop; the claim was purely evidentiary in nature and the defendant could not transform an unpreserved evidentiary claim into one of prosecutorial impropriety to obtain review of the claim, and, nevertheless, the prosecutor's comment referred to facts in evidence and was not improper.

   b. Certain remarks by the prosecutor that DNA from two individuals was present on the mop handle and that the defendant was the last person to touch the mop were not improper because they were based on evidence and testimony from a forensic science examiner that the defendant and the victim could not be ruled out as contributors to that DNA, and the prosecutor's argument that the defendant had touched the window latch in the bathroom was not unduly speculative, as it was based on evidence adduced at trial.

   c. The prosecutor did not improperly offer her personal opinion, make inflammatory statements or vouch for the credibility of certain witnesses during closing argument; the prosecutor's statement that she was "guessing" that the victim let the defendant enter his apartment was not improper and was based on the evidence presented, the prosecutor's

remark that it was odd that the defendant would ask a friend to throw away the defendant's freshly laundered jeans was an appeal to the jury's common sense and life experiences, and the prosecutor did not vouch for the credibility of certain witnesses when she commented about the defendant's disregard for the safety of children relative to the knife that was found in L's home, as her remarks were in response to those made during defense counsel's argument to the jury, and were based on evidence that the victim died from stab wounds and that there were children in L's residence where her minor son found the knife.

3. The trial court did not abuse its discretion when it denied the defendant's motion for a new trial, in which he alleged that the state's allegedly late disclosure to him of certain discovery materials deprived him of his due process rights under *Brady* v. *Maryland* (373 U.S. 83); the materials at issue were not suppressed within the meaning of *Brady*, as the evidence was disclosed prior to the start of evidence, and the defendant failed to establish how he was prejudiced, as he had the opportunity to cross-examine the witnesses to whom the discovery pertained and he failed to move to recall the witnesses to testify or to request a continuance.

Argued December 6, 2017—officially released April 3, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of burglary in the first degree, murder, larceny in the third degree, larceny in the fourth degree, stealing a firearm, criminal possession of a firearm, sale of narcotics and possession of narcotics, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Bentivegna, J.*; thereafter, the court denied the defendant's motion to preclude certain evidence; verdict of guilty; subsequently, the court denied the defendant's motion for a new trial and rendered judgment in accordance with the verdict, from which the defendant appealed. *Affirmed.*

*Robert L. O'Brien*, assigned counsel, with whom, on the brief, was *Christopher Duby*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, *Vicki Melchiorre*, supervisory assistant state's attorney, and *Elizabeth S. Tanaka*, assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Carl Small, was convicted, after a jury trial, of murder in violation of General Statutes § 53a-54a (a), burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), larceny in the third degree in violation of General Statutes § 53a-124 (a) (1), larceny in the fourth degree in violation of General Statutes § 53a-125 (a), stealing a firearm in violation of General Statutes § 53a-212, criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1), sale of narcotics in violation of General Statutes § 21a-277 (a), and possession of narcotics in violation of General Statutes § 21a-279 (a). On appeal, the defendant claims that: (1) the trial court abused its discretion in admitting evidence of criminal gangs; (2) he was deprived of his constitutional right to a fair trial by prosecutorial improprieties; and (3) the court abused its discretion in denying his motion for a new trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In June, 2012, the defendant lived in Bloomfield with Lenionell Frost and Frost's mother. Frost was a customer at Sovereign Bank in West Hartford, where he became acquainted with the victim, Christopher Donato, a bank teller. On June 4, 2012, the defendant and Frost visited the victim at his apartment in Hartford. The victim had a collection of rifles, handguns, ammunition, knives, guitars and electronic equipment. The victim allowed the defendant and Frost to handle the guns. The victim expressed an interest in obtaining ecstasy pills, and the defendant indicated that he could assist the victim.

Sometime thereafter, the victim gave the defendant approximately one thousand dollars and, on June 8, 2012, the defendant and Frost returned to the victim's apartment. During the visit, the defendant gave the victim a bag of ecstasy pills. The defendant asked the victim if he could borrow one of his guns, and the victim replied in the negative. After the defendant and Frost left the apartment, the victim showed the ecstasy pills to his girlfriend, Katherine Robert, and informed her that he intended to sell them.

On June 11, 2012, the victim told his college friend, Andrew Zippin, that he had purchased ecstasy pills and suspected that the seller had sold him a substandard product. After testing some of the pills, Zippin agreed with the victim's assessment. Sometime thereafter, the victim informed Zippin that he was meeting with the defendant in order either to obtain new ecstasy pills or to get his money back.

On June 16, 2012, the victim called Robert, and the two agreed that Robert would visit the victim at his apartment at approximately 6 p.m. or 7 p.m. that night. Cell phone records indicate that the last phone call the

victim made to Robert from his cell phone was at 3:12 p.m. The victim's father sent a text message to him at 5:33 p.m., and the victim replied. Robert arrived at the rear parking lot of the apartment building where the victim lived at 7:15 p.m. Robert called and sent a text message to the victim, but did not receive a response. When Robert did not find a key under the doormat to the victim's apartment as the two previously had arranged, she knocked on the door. When the victim failed to respond, Robert banged on the door and screamed to the victim to let her in. At 7:29 p.m., when Robert was outside the victim's apartment, she received a text message from the victim's phone stating that he had walked to a store, was "2 messed up 2 drive," and asking her to "plz" pick him up at the corner of Prospect Avenue and Kane Street. Robert thought it was unusual that the text contained the abbreviation "plz," which the victim did not use in text messages, and that the victim had walked to the store because the victim was unwilling to walk distances as a result of constant pain he experienced due to scoliosis.

Robert walked to her car and received another text message from the victim's cell phone, at 7:31 p.m., asking her location. Robert replied that she was coming to get him. Robert drove to the designated location, but could not locate the victim. Robert sent a text message to the victim's cell phone numerous times and received no response. Robert returned to the victim's apartment building, but returned home when she noticed that the victim's car, which had been in the parking lot when she left to find the victim, was gone. At 9 p.m., the victim's neighbor noticed red shoe treads on the common hallway floor.

That evening, the defendant arrived at Lechaun Milton's residence in Hartford with a duffle bag. He asked Milton if she had ammonia to clean a gun and inquired whether she knew someone who wanted to buy a gun. Milton responded in the negative to both questions. The defendant left on foot and arrived on Vine Street at the nearby house of Milton's sister, Latasha Drummond, at about sunset. While he was there, Latasha Drummond noticed that he was pacing, appeared nervous, and made several phone calls. When Latasha Drummond asked the defendant why he was bleeding, he explained that he had cut his hand. At 8:44 p.m., the defendant used his cell phone to call Felix Rodriguez, a ranking member of the Bronx, New York chapter of the national street gang, the Bloods. At about 9:45 p.m., the defendant called Frost and asked Frost to drive him home. Upon returning to his Bloomfield residence, the defendant told Frost that he needed to take a shower and to change his clothes. The defendant borrowed a pair of Frost's sneakers. Frost drove the defendant to a shopping center in Bloomfield, where the defendant wanted to take a bus to Hartford so that he could return to Vine Street.

The following morning, the defendant telephoned Frost and asked him to launder his black jeans, then place them in the trash. The defendant arrived at Shanell Milner's residence in Hartford with a bag containing guns, bullets, knives, laptops and headphones. He asked Milner if she knew anyone who might be interested in purchasing the items, and Milner responded that she did not.

The victim did not report for work the following Monday, June 18, 2012, nor did he respond to text messages or phone calls from the bank manager. The police went to the victim's apartment at the request of his parents. The police found bloody shoe prints on the hallway floor and the victim's body in his apartment. The victim had died from multiple stab wounds to his torso. The apartment appeared to be ransacked, and the victim's firearms and other possessions were missing. There was a bloodied Swiffer mop in the bathtub and a bloody fingerprint on the latch of the bathroom window. DNA testing of the blood on the latch eliminated the victim as a contributor but was not sufficient to include or exclude the defendant as a contributor. The following day, the police found the victim's car near Vine Street. DNA testing of bloodstains on the steering wheel and the interior latch of the driver's door matched the defendant's DNA profile. The expected frequency of individuals who could be a contributor of DNA to the bloodstains was less than 1 in 7 billion.

On June 19, 2012, Latasha Drummond's boyfriend, Andrew Rison, noticed that the defendant was carrying a bag and saw that the defendant's hand was injured. When Rison asked the defendant, who appeared nervous, what was wrong, the defendant replied that he "had to fuck up this cracker real bad" and mentioned a robbery. The defendant then asked Rison if he knew anyone who wanted to purchase a gun.

The defendant spent the evening of June 20, 2012, at Milner's residence. The defendant told Milner that he "caught a body," which Milner understood to mean that he had killed someone. That evening, the defendant communicated on Facebook with Rodriguez. The Facebook messages between the defendant and Rodriguez at that time concerned guns, money, and ecstasy.

The defendant was arrested on June 28, 2012, in Philadelphia, Pennsylvania. He thereafter was charged with murder in violation of § 53a-54a (a), burglary in the first degree in violation of § 53a-101 (a) (2), larceny in the third degree in violation of § 53a-124 (a) (1), larceny in the fourth degree in violation of § 53a-125 (a), stealing a firearm in violation of § 53a-212, criminal possession of a firearm in violation of § 53a-217 (a) (1), sale of narcotics in violation of § 21a-277 (a), and possession of narcotics in violation of § 21a-279 (a). Following a jury trial, the defendant was convicted of all charges.

The court imposed a total effective sentence of seventy years incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court abused its discretion in admitting certain evidence relating to the Bloods. We disagree.

During the state's case-in-chief, defense counsel filed a motion in limine seeking to preclude Matthew King, an agent with the Federal Bureau of Investigation, from testifying about Rodriguez' involvement with the Bloods. The prosecutor argued that the state was not making any claim that the defendant was a member of the Bloods, but that the evidence would tend to show that the defendant contacted an individual who as a member of the Bloods might be interested in purchasing guns. The court denied the motion, concluding that the testimony was relevant and that its probative value outweighed its prejudicial effect.

King testified that he had studied the Bloods for more than three years and that during that time he had become familiar with terminology used by the Bloods. He testified that Rodriguez' street name was "Murdaveli Cokeboy Rollack," which indicated that Rodriguez was a member of the "sex, money, murder Bloods" based in Bronx, New York, who were active in the south end of Hartford. King explained that the Bloods use guns to engage in criminal activity and that they obtain their guns in any way they can. He defined certain slang terminology used by the defendant and Rodriguez in their Facebook communications. When questioned about the defendant's June 7, 2012 Facebook message to Rodriguez, asking, "[g]ot anybody dat got skittles," King explained that the word "skittles" referred to ecstasy. King also clarified that when the defendant informed Rodriguez on June 20, 2012, that: "I got to get low but I need extra paper, mu," and, "[t]ake this bag of goodies off my hand for seven hundred," "paper" was slang for money, "mu" meant blood, and "goodies" could be anything someone is trying to sell. The messages also discussed "DVDs," which King explained referred to guns.

The defendant argues that evidence of Rodriguez' gang affiliation was irrelevant and highly prejudicial. He contends that the state made no allegation and presented no evidence that he was a member of a gang, and that Rodriguez' gang affiliation was not relevant to the jury's understanding of slang terminology or to its ultimate decision as to whether the defendant had murdered the victim. The defendant argues that the gang evidence was prejudicial in that it suggested that he should be convicted because he was involved in gang activity. We are not persuaded.

"Relevant evidence is evidence that has a logical ten-

dency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . All that is required is that the evidence tend to support a relevant fact *even to a slight degree*, so long as it is not prejudicial or merely cumulative. . . .

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . Reversal is required only whe[n] an abuse of discretion is manifest or whe[n] injustice appears to have been done." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 429–30, 64 A.3d 91 (2013).

In the present case, evidence of Rodriguez' gang affiliation, if credited by the jury, was probative, at least to a slight degree, as to the defendant's identity as the perpetrator on the basis of his desire to sell the victim's firearms through various means in the aftermath of the murder and burglary. There was evidence that the defendant, despite his inquiries to several of his friends, was unable to find a potential gun buyer in the days following the murder. On June 20, 2012, four days following the murder and before the defendant left the state for Pennsylvania, he communicated with Rodriguez through Facebook. These communications indicated that the defendant attempted to sell the victim's firearms to someone who was a member of the Bloods, a gang that sought to obtain firearms however possible.

We also conclude that the court properly found that the probative value of King's testimony was not outweighed by any unfair prejudice to the defendant. Despite the slight probative value of the evidence, there was a limited risk of unfair prejudice. There was no allegation that the defendant was a gang member. King's testimony demonstrated *only* Rodriguez' gang involvement. King testified on cross-examination that he was making no claim that the defendant was a member of any gang. During closing argument, the prosecutor explained: "It's not against the law for somebody to talk to a gang member or gang leader. . . . It's simply evidence that he was trying to sell the guns to someone he knew would likely be interested in buying them. . . . We're not claiming the defendant is a gang member. We are not claiming you should convict him because

he is a gang member." We conclude that the court did not abuse its discretion in allowing King to testify as to Rodriguez' gang involvement.

II

The defendant next claims that his right to a fair trial was violated by several prosecutorial improprieties. We disagree.

"The standard of review governing claims of prosecutorial impropriety is well established. In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . . [If] a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Ross*, 151 Conn. App. 687, 693, 95 A.3d 1208, cert. denied, 314 Conn. 926, 101 A.3d 271, 272 (2014).

A

The defendant claims that the prosecutor committed "the prosecutor's fallacy" by eliciting false scientific evidence and commenting on such evidence during her closing argument. We are not persuaded.

A prosecutor employs "the prosecutor's fallacy" by equating random match probability with source probability in relation to DNA evidence. "Random match probability and source probability are distinguishable. The prosecutor's fallacy is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample. . . . Random match probability is the probability a member of the general population would share the same DNA with the defendant. . . . Source probability is the probability that someone other than the defendant is the source of the DNA found at the crime scene." (Citation omitted; internal quotation marks omitted.) *State* v. *Marrero-Alejandro*, 159 Conn. App. 376, 383 n.3, 122 A.3d 272 (2015), appeal dismissed, 324 Conn. 780, 154 A.3d 1005 (2017).

This claim solely concerns DNA evidence present on the handle of the bloodied Swiffer mop that the police found in the victim's bathtub and not the other DNA evidence. Nicholas Yang, a state DNA forensic science examiner, testified on direct examination that he com-

pared the "touch DNA" profile[1] on the Swiffer mop handle to the defendant's known DNA profile and concluded that the defendant could not be eliminated as a contributor. He explained that the "expected frequency of individuals who cannot be . . . eliminated as a contributor to the DNA profile from [that] submission . . . is about one in 1300 in the African-American population and about one in 1200 in both the Caucasian and Hispanic populations." The prosecutor inquired, "[a]nd does that also exclude more than 99.9 percent of the population?" Yang replied, "99.9 something, yes." Defense counsel did not object to the admission of this evidence.

During closing argument, the prosecutor stated: "And with regard to the calculation on the Swiffer mop . . . you heard the calculation from Mr. Yang . . . it was one in thirteen hundred, which sounds far less impressive than 1 in 7 billion, but when you do the statistical calculation excludes 99.9 percent of the population. So, when you put that in context with all the other evidence, ladies and gentlemen, you know that's the defendant's DNA."

The defendant argues that the prosecutor elicited scientifically false testimony from Yang that 99.9 percent of the population was excluded and that the percentage testimony improperly equated random match probability with source probability. He further argues that the prosecutor engaged in impropriety during closing argument when she committed the prosecutor's fallacy by referring to Yang's testimony. We are not persuaded.

The defendant's claim that the prosecutor elicited scientifically false evidence through Yang is purely evidentiary. The defendant did not object to the admission of the evidence at issue. "Although our Supreme Court has held that unpreserved claims of prosecutorial impropriety are to be reviewed under the *Williams* factors,[2] that rule does not pertain to mere evidentiary claims masquerading as constitutional violations. . . . Evidentiary claims do not merit review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because they are not of constitutional magnitude. . . . [A] defendant may not transform an unpreserved evidentiary claim into one of prosecutorial impropriety to obtain review of the claim." (Citation omitted; footnote added; internal quotation marks omitted.) *State* v. *Cromety*, 102 Conn. App. 425, 431, 925 A.2d 1133, cert. denied, 284 Conn. 912, 931 A.2d 932 (2007); see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third condition of *Golding*). We, therefore, decline to review this unpreserved evidentiary claim.

The prosecutor's comment during closing argument referred to facts in evidence and, therefore, was not improper.[3] "It is not . . . improper for the prosecutor

to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 435, 902 A.2d 636 (2006).

## B

The defendant next claims that the prosecutor engaged in impropriety when she relied on facts not in evidence and invited sheer speculation. We disagree.

With respect to this issue, we note that "[a] prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence." *State* v. *Singh*, 259 Conn. 693, 718, 793 A.2d 226 (2002).

## 1

The defendant argues that the prosecutor made improper remarks during rebuttal argument when she stated that (1) DNA from only two individuals was on the mop handle and (2) the defendant was the last person to touch the mop handle. We disagree.

Yang testified that the Swiffer mop handle contained a mixture of DNA and that neither the defendant nor the victim could be eliminated as having contributed to that mixture. Yang testified regarding the random match probabilities that were consistent with the DNA of the defendant and the victim, respectively. Defense counsel argued during closing argument that the defendant had visited the victim's apartment multiple times and that it was unclear when the defendant's "touch DNA" had been placed on the handle of the Swiffer mop. During her rebuttal closing argument, the prosecutor stated: "The last person to use that . . . Swiffer mop was the killer. There were only two people's DNA on that mop handle, [the defendant and the victim]. So, unless you think that [the victim] got up off the floor after those three huge stab wounds and cleaned up his own blood, that means that [the defendant] is the killer."

The prosecutor's comments were not improper. The prosecutor's comment that DNA from two individuals was present on the mop handle was based on Yang's testimony that the defendant and the victim could not be ruled out as contributors. Her comment that the defendant was the last person to handle the Swiffer mop was also based on the evidence presented at trial.

## 2

The defendant argues that the prosecutor invited speculation by suggesting, despite a lack of supporting evidence, that the defendant touched the window latch in the victim's bathroom in an effort to see if Robert had left the apartment building. We disagree.

During closing argument, the prosecutor stated: "I have no proof of it . . . [b]ut you do know that there is a bloody thumb print or fingerprint on the window

latch. Perhaps [the defendant] looked out the window to see, to make sure [Robert] was gone. You know that that window looks out [at] the driveway that leads to and from the parking lot." Yang testified that when performing DNA testing on the blood found on the window latch in the victim's apartment, laboratory technicians were able to obtain information from only one of the fifteen loci on a DNA profile. He explained that the results of testing samples from that one location were sufficient to eliminate the victim, Frost, and Rison as contributors; were consistent with Robert's DNA at that location; and were insufficient to include or exclude the defendant or Zippin as contributors.

Although DNA testing was insufficient to link the defendant to the bloody fingerprint on the window latch, the prosecutor's comment was not unduly speculative. The prosecutor's argument that the jury reasonably could find that the defendant had touched the window latch in an effort to see if Robert had left the apartment building was based on evidence adduced at trial. In particular, there was evidence that Robert received an unusual text message from the victim's phone asking her to leave when she was banging on the door to the victim's apartment; Robert received a follow-up text message from the victim's phone inquiring as to her location; the bathroom window overlooked the driveway leading to the rear parking lot; and later on the night of the murder, the defendant appeared at a friend's house with a cut on his hand.

C

The defendant also argues that the prosecutor improperly offered her personal opinion, made inflammatory statements and vouched for the credibility of witnesses during her closing argument. We conclude that the prosecutor did not engage in misconduct when she made the comments in question during her closing arguments.

We begin with a discussion of the relevant law. "[T]he prosecutor may not express his [or her] own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his [or her] opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . A prosecutor also may not appeal to the emotions, passions and prejudices of the jurors . . . ." (Internal quotation marks omitted.) *State* v. *Santiago*, 269 Conn. 726, 735, 850 A.2d 199 (2004). "[A]n improper appeal to the jurors' emotions can take the form of a

personal attack on the defendant's character . . . ." (Internal quotation marks omitted.) *State* v. *Santiago*, 143 Conn. App. 26, 37, 66 A.3d 520 (2013).

### 1

The defendant claims that the prosecutor improperly opined as to the meaning of evidence when she stated that she was "guessing" that the victim let the defendant enter his apartment. During closing argument, the prosecutor stated: "First element of burglary in the first degree, entered and unlawfully remained in an apartment. We have no signs of forced entry here. I'm guessing [the victim] let [the defendant] in. *Didn't let him in to stab him and rob him.*" (Emphasis added.)

The prosecutor's comment was not improper. When the prosecutor used the word "guess," she was not improperly opining on evidence. Rather, she was discussing an element of burglary, and arguing to the jury that there were no signs of forced entry and that it was possible for the jury to infer that the victim let the defendant into his apartment. "It is not . . . improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Luster*, supra, 279 Conn. 435.

### 2

The defendant argues that the prosecutor improperly expressed her opinion when she stated that it was "odd" that the defendant would ask Frost to throw away freshly laundered jeans. The prosecutor commented during closing argument on the defendant's request to Frost to wash his black jeans and then place them in the trash: "And you know, Frost said it's not unusual for [the defendant] to ask me to wash his clothes. It was unusual for him to ask to throw them away. I guess, my reaction as a female is, why the heck didn't you just tell me to throw them away? Why'd you have me wash 'em? That's odd behavior, ladies and gentlemen. That is odd behavior."

The prosecutor's comments directly related to Frost's testimony that he did not think it was "odd" that the defendant requested that he launder the defendant's black jeans and place them in the trash. In the course of discussing the evidence presented at trial, the prosecutor was not bound by Frost's characterization of the defendant's request. We conclude that the prosecutor's comments were merely an appeal to the jury's common sense and life experiences. Therefore, the prosecutor's comments were not improper. "Our case law reflects the expectation that jurors . . . will consider evidence on the basis of their common sense. Jurors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may

be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Guadalupe*, 66 Conn. App. 819, 826, 786 A.2d 494 (2001), cert. denied, 259 Conn. 907, 789 A.2d 996 (2002).

3

The defendant's next argument concerns the prosecutor's comments during rebuttal argument regarding Latasha Drummond's minor son, Elijah Drummond. Elijah Drummond testified that in June, 2012, he found a knife in a bathroom closet and that he placed the knife under his bed. During a search of the residence of Latasha Drummond and Rison, the police found and seized the knife, which had a blade of approximately ten inches, from a bedroom. Robert identified the knife as having belonged to the victim. There were no identifiable fingerprints on the knife and the knife tested negative for blood. During closing argument, defense counsel suggested that the knife belonged to Rison and was not the murder weapon. During rebuttal argument, the prosecutor asked whether the jury thought Rison would have left a large knife in a location where Elijah Drummond could locate it and be harmed. The prosecutor stated, "[t]he defendant, who doesn't care anything about those children or to put a knife in a place where he didn't care . . . if a child found it. We're lucky that little child found it and put it in his room and didn't get hurt. As far as we know, he didn't get hurt. I would ask if [Latasha Drummond and Rison] strike you as that type of people who didn't love and care for their children?"

The defendant argues that the prosecutor made inflammatory comments about the defendant's disregard for the safety of children and that the prosecutor improperly vouched for Latasha Drummond and Rison when she asked if the jury thought Latasha Drummond and Rison did not love and care for their children. We do not agree.

The prosecutor's comments were in response to defense counsel's comment made during rebuttal argument that Rison may have placed the knife in the closet. The prosecutor did not improperly vouch for the credibility of Rison or Latasha Drummond, but asked the jury to draw on common sense to determine if they were likely to place a knife where a child in their household could find it. The prosecutor's comment that the defendant hid the knife in Latasha Drummond's residence without regard for the safety of the children in the household was a comment on the evidence presented that the victim died from stab wounds, the defendant appeared nervous and was carrying a duffle bag on the night of the murder, there were children in Latasha Drummond's residence and that Elijah Drummond found a knife in the closet. See *State* v. *Oehman*, 212 Conn. 325, 334, 562 A.2d 493 (1989) (prosecutor's characterization of defendant as "coward" not impermissi-

ble in light of evidence presented).

### III

The defendant's final claim is that the court abused its discretion in denying his motion for a new trial. We disagree.

On September 30, 2014, the day before the start of evidence, defense counsel filed a motion in limine to preclude the testimony of Rison, Milner and Latasha Drummond on the ground that the state prejudiced the defendant by providing defense counsel that very day with a lengthy packet of discovery materials that pertained, in part, to those witnesses. The next day, October 1, 2014, the prosecutor stated during argument to the court that the disclosure contained certain information concerning Latasha Drummond and Rison. The court denied the motion in limine, reasoning that it had heard nothing that would prevent the state from calling those three witnesses to testify that day, October 1, 2014.

Prior to sentencing, the defendant filed a motion for a new trial in which he argued that the court erred by denying his motion in limine to preclude the testimony of Rison, Milner and Latasha Drummond. The court denied the motion "[b]ased on the evidence presented at trial . . . ."

The defendant argues that the state's late disclosure of exculpatory materials deprived him of his due process rights due according to *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). He argues that the state disclosed the information packet the day before the witnesses testified and that each witness testified to at least one fact that he or she had not disclosed previously: Latasha Drummond testified that when the defendant came to her house on June 16, 2012, it was dark outside; Rison testified that on June 16, the defendant inquired about a gun buyer and mentioned a robbery; and Milner testified that the defendant, who did not own a car, showed her a car key and told her that he had gotten a car. He contends that, as a result, the witnesses were not cross-examined regarding the details of the matter pertaining to Rison and Latasha Drummond, and Rison and Latasha Drummond were not "pushed further on inconsistencies in what they had said."

"Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a new trial is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for [a new trial], we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at

trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *McIntyre*, 250 Conn. 526, 533, 737 A.2d 392 (1999).

"Under *Brady* v. *Maryland*, [supra, 373 U.S. 87], [t]he state is constitutionally obligated to disclose certain information to a defendant. The principles of due process require the prosecution to disclose exculpatory evidence that is material to a defendant's guilt or punishment. . . . In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material." (Internal quotation marks omitted.) *State* v. *Morrill*, 42 Conn. App. 669, 677, 681 A.2d 369 (1996).

The evidence in the present case was disclosed prior to the start of evidence. "[E]vidence known to the defendant or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Walker*, 214 Conn. 122, 126, 571 A.2d 686 (1990). The defendant's reliance on *Brady* is misplaced because he has no basis to claim suppression. See id. The defendant in this case "can complain only of the timing of the disclosure. . . . Under such circumstances the defendant bears the burden of proving that he was prejudiced by the failure of the state to make [the] information available to him at an earlier time." (Citation omitted.) Id., 126–27.

The defendant also has failed to establish how he was prejudiced by the alleged late disclosure. Latasha Drummond testified on cross-examination that she did not tell the police that the defendant came to her house at dusk on June 16, 2012, Rison testified on cross-examination that he did not tell the police that the defendant mentioned a robbery and Milner testified that she did not tell the police that the defendant had a car. The witnesses were not cross-examined regarding the details of the matter pertaining to Rison and Latasha Drummond, although the prosecutor had elicited evidence, during the direct examination of Latasha Drummond, regarding her and Rison. The defendant had an opportunity to draw attention to any inconsistencies between the statements the three witnesses gave to the police and their trial testimony. If defense counsel wanted to use material in the packet for impeachment purposes, he could have moved to recall the witnesses or requested a continuance; the defendant, however, did neither of those things. The defendant has failed to demonstrate any prejudice resulting from the state's failure to disclose the packet on an earlier date. Accordingly, we conclude that the court did not abuse its

discretion in denying the defendant's motion for a new trial.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Yang explained that the term "touch DNA" refers to a type of DNA sample wherein an individual deposits DNA on an object by handling it.

[2] See *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).

[3] Even if the underlying evidentiary claim were reviewable, Yang's testimony did not equate random match probability with source probability. Yang expressed random match probability as a percentage. The prosecutor argued during closing argument that Yang's touch DNA testimony, "*in context with all the other evidence*," indicated that the defendant's DNA was on the mop handle. (Emphasis added.) It was not improper for the prosecutor to invite the jury to draw a reasonable inference based on the evidence presented at trial.